**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | |
|---|---|
| SAFI M. RIAZ, BESSIE M. MCADAMS, KEITH O. EDWARDS and PETER H. DARGEL, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) |
| ADVANCE STORES COMPANY, INC., THE BOARD OF DIRECTORS OF ADVANCE STORES COMPANY, INC., THE RETIREMENT COMMITTEE OF THE ADVANCE AUTO PARTS, INC. 401(K) PLAN and JOHN DOES 1-30, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**CIVIL ACTION NO.:** 7:21cv00619

**CLASS ACTION COMPLAINT**

**COMPLAINT**

Plaintiffs, Safi M. Riaz, Bessie M. McAdams, Keith O. Edwards and Peter H. Dargel

("Plaintiffs"), by and through their attorneys, on behalf of the Advance Auto Parts, Inc. 401(k)

Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, which include Advance Stores Company, Inc. ("Advance" or "Company") and

the Board of Directors of Advance Stores Company, Inc. and its members during the Class Period[2]

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as December 8, 2015 through the date of judgment. In addition, Advance Stores Company, Inc. is a wholly owned

("Board") and the Retirement Committee of Advance Auto Parts, Inc. 401(k) Plan and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

3.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

subsidiary of Advance Auto Parts, Inc. and as such it may have its own Board of Directors or may utilize the Board of Directors of Advance Auto Parts, Inc. to undertake the fiduciary obligations described herein.  As used herein, the term "Board" should be construed broadly to account for both possibilities.

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period, the Plan had at least $500 million dollars in assets under management.  At the end of 2020 and 2019, the Plan had over $1 billion dollars and $900 million dollars, respectively, in assets under management that were/are entrusted to the care

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last accessed November 29, 2021) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the Advance Auto Parts, Inc. 401(k) Plan ("2020 Auditor Report") at 3.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.      Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan despite their lower fees.

13.     Because "the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

14.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

15.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

17.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III. PARTIES

**Plaintiffs**

19.     Plaintiff, Safi M. Riaz ("Riaz"), resides in Macomb, Michigan. During his employment, Plaintiff Riaz participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

20.     Plaintiff, Bessie M. McAdams ("McAdams"), resides in Surprise, Arizona. During her employment, Plaintiff McAdams participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

21.     Plaintiff, Keith O. Edwards ("Edwards"), resides in Cusseta, Alabama. During his employment, Plaintiff Edwards participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

22.     Plaintiff, Peter H. Dargel ("Dargel"), resides in Succasunna, New Jersey. During his employment, Plaintiff Dargel participated in the Plan investing in the options offered by the Plan and was, among other things, subject to the excessive administration and recordkeeping costs alleged below.

23.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

25.    Advance Stores Company, Inc. ("Advance" or "Company") is the Plan sponsor and a named fiduciary having a principal place of business as 5008 Airport Road, Roanoke, Virginia. The December 31, 2020 Form 5500 of the Advance Auto Parts, Inc. 401(k) Plan filed with the United States Department of Labor ("2020 Form 5500") at 1. Advance "is a leading automotive aftermarket parts provider that serves both professional installer and do-it-yourself customers. As of October 9, 2021, Advance operated 4,727 stores and 234 Worldpac branches in the United States, Canada, Puerto Rico and the U.S. Virgin Islands."[4]

26.    Advance appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[4] https://ir.advanceautoparts.com/investors/overview/default.aspx last accessed on November 29, 2021.

27.     Accordingly, Advance during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

28.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

29.      Advance, acting through the Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

31.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

32.     A discussed above, Advance and the Board appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate, had no more expense than reasonable and performed well as compared to their peers.

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**<u>Additional John Doe Defendants</u>**

35.     To the extent that there are additional officers, employees and/or contractors of Advance who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Advance officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 8, 2015 through the date of judgment (the "Class Period").

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

37.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 22,064 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500 at 2.

38.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

        A.     Whether Defendants are/were fiduciaries of the Plan;

        B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

        C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

        D.     The proper form of equitable and injunctive relief; and

        E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   THE PLAN

43.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2020 Auditor Report at 5. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

44.     In general, "salaried employees who are 21 years of age or older are eligible to participate in the Plan on the first day of each month following their dates of hire.." *Id.*

*Contributions*

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

46.     With regard to employee contributions: "[p]articipants may contribute from 1% to 80% of their eligible compensation on a pretax or after-tax basis as defined by the Plan and subject to certain statutory limitations." *Id*. With regard to matching contributions made by Advance, Advance will make "a safe harbor matching contribution equal to 100% of each participant's contribution for the first 3% of eligible compensation and 50% of each additional 1% of each participant's eligible compensation contributed to the Plan up to 5% … ." *Id.*

47.     Like other companies that sponsor 401(k) plans for their employees, Advance enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

48.     Advance also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

49.     Given the size of the Plan, Advance likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

50.     With regard to contributions made by participants to the Plan: "[p]articipants are immediately vested in their own voluntary contributions, safe harbor matching contributions, and earnings thereon." 2020 Auditor Report at 6. Matching contributions made by Advance are subject to a vesting schedule based on years of continuous service. *Id.*

### The Plan's Investments

51.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

52.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

53.     The Plan's assets under management for all funds as of December 31, 2020 was $1,011,730,601.  2020 Auditor Report at 3.

### Payment of Plan Expenses

54.     During the Class Period, administrative expenses were generally paid using Plan assets. 2020 Auditor Report at 9.

## VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

A.   **The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

55.      As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

56.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under

ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

57.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

58.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

59.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in *inter alia*, (1) the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, and (2) payment of excessive recordkeeping and administration fees, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (1)   The Plan's Total Plan Costs Much Higher than Those of Its Peers

60.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst working through its related analytical arm the Investment Company

Institute ("ICI") "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios." [6]

61. Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return." Vanguard's Principles for Investing Success, at 17.[7]

62. The ICI conducted a study in 2018 (*see* fn. 6) which calculated the average total plan costs from hundreds of 401(k) Plans ranging in size from the smallest plans having less than 1 million dollars in assets all the way up the nation's largest plans with assets under management of more than 1 billion dollars. Looking at plans that have over 1 billion dollars, the ICI determined that the average asset weighted total plan cost or TPC for 401(k) Plans with over 1 billion dollars in assets under management is .24% of total plan assets.

63. Here, one indication that the Plan was poorly run and lacked a prudent process for selecting and monitoring the Plan's investments is that it had a TPC of more than .37%, or, in other words, more than 54% higher than the average.

### (2) The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

64. Another indication of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

---

[6] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2018* at 55 (July 2021) (hereafter, "ICI Study") available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

[7] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

65.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

66.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.   Recordkeeping;

B.   Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.   Administrative services related to converting a plan from one recordkeeper to another;

D.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.   Maintenance of an employer stock fund (if needed);

F.   Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.   Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[8] (excluding the separate fee charged by an independent third-party auditor);

I.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

67.    This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

68.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

A.  Loan processing;

B.  Brokerage services/account maintenance (if offered by the plan);

C.  Distribution services; and

---

[8] The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

> D.  Processing of qualified domestic relations orders.

69.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

70.     The cost of providing recordkeeping services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

71.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

72.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

73.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

74.     In this matter, using revenue sharing or a combination of revenue sharing and a flat fee to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

75.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if recordkeeping and administrative expenses appear high in relation to the general marketplace, and specifically, of like-situated plans.  More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

76.     The fact that the Plan has stayed with the same recordkeeper, namely, Fidelity, over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping

and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

77.    As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were unreasonably high when benchmarked against similar plans.

| Year | Participants | Direct | Indirect[9] | Total Comp | Cost Per Participant |
|------|--------------|--------|-------------|------------|----------------------|
| **2016** | 22,567 | $133,314 | $1,183,279 | $1,316,593 | $58.34 |
| **2017** | 23,197 | $223,189 | $1,766,120 | $1,989,309 | $85.76 |
| **2018** | 22,720 | $246,157 | $1,504,439 | $1,750,596 | $77.05 |
| **2019** | 20,645 | $726,858 | $857,137 | $1,583,995 | $76.73 |
| **2020** | 22,064 | $1,069,833 | $575,805 | $1,645,638 | $74.58 |

78.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

79.    At all times during the Class Period, the Plan had over 20,000 participants making it eligible for some of the lowest fees on the market.

80.    Further, NEPC, a consulting group, recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[10]   The sample size and respondents included 121 Defined Contribution

---

[9] Indirect costs are estimated but are likely conservative. Discovery may reveal additional sources of revenue sharing which will drive the per participant costs even higher. The indirect costs reported are derived from the Form 5500s and more specifically any amounts coded as 15, 21, 36, 37, 38 and 50. These codes refer to recordkeeping and administrative costs. Although, the 2019 and 2020 Auditor Report indicates that some of this amount may have been paid back to the Plan, it's not clear exactly how much and how it was applied. In addition, it appears that from 2019 forward, at least, there was a contracted for recordkeeping fee of $43 per participant, however it's not clear if revenue sharing was used on top of that number to pay for additional services. However, even if all revenue sharing was paid back to the Plan, $43 per participant is itself high as will be discussed herein.

[10] Available at
https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  *See* Report at 1.

81.    NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly under $40 per participant recordkeeping, trust and custody fees.  Report at 10.

82.    Further, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day.[11]

83.    In addition, the NEPC study analyzed the prudence of offering administration and recordkeeping as a percentage of assets. As discussed above, the Plan, from at least 2015 to the end of 2018, used 0.22% of total plan assets to pay for administration and recordkeeping. The NEPC study found that no plan with over 15,000 participants paid more than .08% of plan assets. However, .08, is the highest possible fee paid by any plan analyzed. The majority of plans with over 15,000 participants paid no more than .04% of plan assets.

84.    Thus, the Plan, with over 20,000 participants and over $1 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present.

---

[11] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

85.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.

86.     Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having more than between 13,000 and 19,000 participants and between $400 million dollars and $1.6 billion in assets under management:

| Comparable Plans' RK&A Fees from Recordkeepers in 2018[12] | | | | | |
|---|---|---|---|---|---|
| Plan | Particip ants | Net Assets | Recordkee ping Fees | Per Particip ant Fee | Recordkeeper |
| **Advance Auto Parts, Inc. 401(k) Plan** | **22,720** | **$820,792,320** | **$1,750,596** | **$77** | **Fidelity** |
| Sutter Health Retirement Income Plan | 13,248 | $448,119,989 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,603,610,831 | $472,673 | $35 | Fidelity |
| The Tax Sheltered Annity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 19,118 | $355,768,325 | $349,756 | $18 | Voya |

87.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the

---

[12] Price calculations are based on Form 5500 information filed by the respective plans for the year 2018. R&A costs are based on Schedule C, service providers with service code "15" and/or "64," which signifies recordkeeping fees.

marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### (3) Many of the Plan's Funds had Investment Management Fees in Excess of Fees for Funds in Similarly-Sized Plans

88.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having between $500 million and $1 billion dollars in assets).

89.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [13]

90.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

91.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these

---

[13] See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet")

obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

92.    Investment options have a fee for investment management and other services. With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

93.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[14]

94.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant. However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power. Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

---

[14] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

95.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." "Best Practices for Plan Fiduciaries," at 37.

96.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

97.     Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

98.     In some cases, expense ratios for the Plan's funds were **300%** above the ICI Median (in the case of Wells Fargo Special Small Cap Value A) and **290%** above the ICI Median (in the case of Brown Capital Mgmt Small Co Inv) in the same category. ICI Study at 66. The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the charts below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| Carillon Scout Mid Cap I | 0.97 % | Domestic Equity | 0.32% |
| Brown Capital Mgmt Small Co Inv | 1.25 % | Domestic Equity | 0.32% |
| Diamond Hill Large Cap A | 0.96 % | Domestic Equity | 0.32% |
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0.32% |
| PIMCO Total Return A | 1.04 % | Domestic Bond | 0.39% |

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| Wells Fargo Special Small Cap Value A | 1.28 % | Domestic Equity | 0.32% |
| Principal Diversified Real Asset Instl | 0.84 % | Non-target date Balanced | 0.28% |
| Fidelity Government MMkt | 0.42 % | Money Markey | 0.11% |

99.     The high cost of the Plan's funds is even more stark when comparing the Plan's

funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Average** |
| Carillon Scout Mid Cap I | 0.97 % | Domestic Equity | 0.39% |
| Brown Capital Mgmt Small Co Inv | 1.25 % | Domestic Equity | 0. 39% |
| Diamond Hill Large Cap A | 0.96 % | Domestic Equity | 0. 39% |
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0. 39% |
| PIMCO Total Return A | 1.04 % | Domestic Bond | 0.30% |
| Wells Fargo Special Small Cap Value A | 1.28 % | Domestic Equity | 0. 39% |
| Principal Diversified Real Asset Instl | 0.84 % | Balanced Non-target date | 0.34% |
| Fidelity Government MMkt | 0.42 % | Money Markey | 0.18% |

100.     Given the excessive costs of the above funds they should have been replaced during

the Class Period.

**(4)     Several of the Plan's Funds With Substantial Assets Were Not in the Lowest Fee Share Class Available to the Plan**

101.     Another fiduciary breach stemming from Defendants' flawed investment

monitoring system resulted in the failure to identify available lower-cost share classes of many of

the funds in the Plan during the Class Period.

102.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

103.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

104.     The total assets under management for all of these funds was over $64 million dollars thus easily qualifying them for lower share classes.  The following chart provides detail on these funds:

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| BCSIX<br>Brown Capital Mgmt Small Co Inv | 1.25 % | BCSSX<br>Brown Capital Mgmt Small Co Instl | 1.05 % | 19.05% |
| DHLAX<br>Diamond Hill Large Cap A | 0.96 % | DHLYX<br>Diamond Hill Large Cap Y | 0.55 % | 74.55% |

| | | | | |
|---|---|---|---|---|
| PTTAX<br>PIMCO Total Return A | 1.04 % | PTTRX<br>PIMCO Total Return Instl | 0.70 % | 48.57% |
| ESPAX<br>Wells Fargo Special Small<br>Cap Value A | 1.28 % | ESPRX<br>Wells Fargo Special Small<br>Cap Value R6 | 0.85 % | 50.59% |
| PDRDX<br>Principal Diversified Real<br>Asset Instl | 0.84 % | PDARX<br>Principal Diversified Real<br>Asset R6 | 0.79 % | 6.33% |
| SPAXX<br>Fidelity Government<br>MMkt | 0.42 % | FNBXX<br>Fidelity Government<br>MMkt K6 | 0.25 % | 68.00% |

105.    At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

106.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds *could not have* (1) a potential for higher return, (2) lower financial risk or (3) more services offered.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

107.    Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

108.    Simply put, a fiduciary to a Large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.

109.    Here, had the Plan's fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plan's investment offerings and monitoring investment performance, the Plan would have moved to the identical lower cost share class of the identical fund. Plan Doc. at 71.

**(5)    Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

110.    The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over $104 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money."[15] Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

111.    Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue.

112.    There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

113.    The chart below choses one of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

---

[15] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

| Current | Current ER | LFA | LFA ER | Savings |
|---|---|---|---|---|
| RERGX<br>American Funds Europacific Growth R6 | 0.46 % | VWILX<br>Vanguard International Growth Adm | 0.33 % | 39.39% |
| BCSIX<br>Brown Capital Mgmt Small Co Inv | 1.25 % | LADVX<br>Lord Abbett Developing Growth R6 | 0.59 % | 111.86% |
| DHLAX<br>Diamond Hill Large Cap A | 0.96 % | VWNAX<br>Vanguard Windsor II Fund Admiral Shares | 0.26 % | 269.23% |
| TBCIX<br>T. Rowe Price Blue Chip Growth I | 0.56 % | VWUAX<br>Vanguard U.S. Growth Fund Admiral Shares | 0.28 % | 100.00% |
| PTTAX<br>PIMCO Total Return A | 1.04 % | PTTRX<br>PIMCO Total Return Instl | 0.70 % | 48.57% |
| ESPAX<br>Wells Fargo Special Small Cap Value A | 1.28 % | DFFVX<br>DFA US Targeted Value I | 0.33 % | 287.88% |
| PDRDX<br>Principal Diversified Real Asset Instl | 0.84 % | PDARX<br>Principal Diversified Real Asset R6 | 0.79 % | 6.33% |
| SPAXX<br>Fidelity Government MMkt | 0.42 % | VUSXX<br>Vanguard Treasury Money Market Investor | 0.09 % | 366.67% |

114.    Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.  The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Current | Benchmark[16] | Alternative Fund | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| American Funds Europacific Growth R6 | iShares MSCI EAFE Growth ETF | Vanguard International Growth Adm | 9.49% | 1.40% | 2.40% |
| | | | 20.62% | 10.94% | 11.56% |
| | | | | | |
| Brown Capital Mgmt Small Co Inv | Vanguard Small-Cap Growth ETF | Lord Abbett Developing Growth R6 | -23.03% | -3.13% | 0.77% |
| | | | 9.06% | 8.23% | 9.16% |
| | | | | | |
| Diamond Hill Large Cap A | iShares Russell 1000 Value ETF | Vanguard Windsor II Fund Admiral Shares | 1.50% | 3.06% | 3.10% |
| | | | 7.84% | 5.30% | 3.98% |
| | | | | | |
| T. Rowe Price Blue Chip Growth I | iShares Russell 1000 Growth ETF | Vanguard U.S. Growth Fund Admiral Shares | -5.55% | -3.09% | 0.81% |

[16] Benchmark funds are chosen from funds that meet two criteria. First, the benchmark must be similar to the fund in the Plan in that a returns-based correlation between the fund in the Plan and all other funds in the third party administrator ("TPA") universe calculated as a standard Pearson product-moment correlation coefficient. Secondly, benchmark funds are compared to the latest positions reported on filings made to the SEC, when available. Using these positions, a holdings-based correlation using the funds' positions and multi-factor risk model based on Arbitrate Pricing Theory and an advance extension of Modern Portfolio Theory. Quantitative similarity is determined as the average correlation between returns-based and holdings-based correlations. 401kFiduciaryOptimizer picks only funds that have historical correlation of greater than .90 with the fund in the plan.

| Current | Benchmark[16] | Alternative Fund | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| | | | 5.70% | 4.15% | 2.91% |
| | | | | | |
| PIMCO Total Return A | iShares Core U.S. Aggregate Bond | | 1.68% | 0.14% | 0.55% |
| | | PIMCO Total Return Instl | 2.02% | 0.50% | 0.91% |
| | | | | | |
| Wells Fargo Special Small Cap Value A | iShares Russell 2000 Value ETF | | -13.01% | -0.11% | -0.82% |
| | | DFA US Targeted Value I | 7.23% | -0.01% | -0.34% |
| | | | | | |
| Principal Diversified Real Asset Instl | 40% SPY, 60% AGG Composite | | -2.11% | 3.38% | 2.65% |
| | | Principal Diversified Real Asset R6 | -2.79% | 3.18% | 2.54% |
| | | | | | |
| Fidelity Government MMkt | | | -0.27% | -0.38% | -0.42% |
| | | Vanguard Treasury Money Market Investor | -0.06% | -0.11% | -0.15% |

115.   As detailed in the chart above, the comparator funds in the chart easily outperformed the funds in the Plan at the 1, 3  and 5 year marks. A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning

of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Prudence
### (Asserted against the Committee)

116.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

117.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

118.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

119.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to negotiate reasonable Plan recordkeeping fees.

120.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

121.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

122.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Advance and the Board Defendants)**

123.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

124.     Advance and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

125.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

126.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

127.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

128.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

129.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a

constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated:  December 8, 2021                    **MICHAEL A. CLEARY, ATTORNEY AT LAW**

                                            */s/ Michael A. Cleary*
                                            Michael A. Cleary, Esquire
                                            VSB No. 19989
                                            4519 Brambleton Avenue, Suite 210
                                            Mailing Address: P.O. Box 21136
                                            Roanoke, Virginia  24018
                                            mclearylaw@gmail.com

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
(*Admission Pro Hac Vice to be Requested)*
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class